UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL OPPORTUNITY
EMPLOYMENT COMMISSION,

      Plaintiff,

v.                                          Case No. 11-13347

J.A. THOMAS & ASSOCIATES, INC.,

      Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the court is Defendant J.A. Thomas & Associates, Inc.'s ("JATA's") motion for summary judgment on Plaintiff EEOC's claim of discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. The motion has been fully briefed, and the court determines a hearing to be unnecessary. *See* E.D. Mich. LR 7.1(f)(2). Because the EEOC has established genuine issues of material fact as to whether it can make a *prima facie* case under the ADA as well as whether JATA's proffered reason for the adverse employment action against Charging Party Sally Lipinski was pretextual, the court will deny summary judgment.

**I. BACKGROUND**

JATA is a medical consulting business based in Atlanta, Georgia, that offers materials and services designed to improve health care workers' clinical documentation practices. (Tully Aff. ¶ 1, Def.'s Ex. 5, Dkt. # 15-2, at 3-20; Tully Dep. 41:2-13, Def.'s

Ex. 3, Dkt. # 15-1, at 3-42.)[1] Lipinski started work at JATA in 2005 as a clinical health information management ("HIM") consultant, a traveling position she took on while living in Michigan. (Tully Aff. ¶ 3; Tully Dep. 55:2-12.)

In August 2005, less than three months after beginning her employment with JATA, Lipinski was hospitalized for a kidney infection. (Lipinski Decl. ¶ 1, Pl.'s Ex. 10, Dkt. # 19-2, at 51-55; Tully Aff. ¶ 4; Tully Dep. 56:1-5.) Severe complications from the infection caused Lipinski to lose several of her fingertips and necessitated the amputation of both her legs below the knees. (Lipinski Decl. ¶¶ 2-5.) Lingering effects from the amputations have required multiple additional surgeries in the years since Lipinski's illness, and she now uses prosthetic limbs to walk. (Lipinski Decl. ¶ 6; Tully Aff. ¶ 6.)

After Lipinski fell ill, in September 2005, JATA placed her on a leave of absence. (Tully Aff. ¶ 5.) While recovering in the hospital, Lipinski informed JATA's Vice President of Clinical Services and Education, Melinda ("Mel") Tully, that she would likely be unable to return to her previous position as a traveling consultant. (12/18/08 Letter 1, Pl.'s Ex. 1, Dkt. # 19-2, at 1-6.) Instead, Lipinski began doing part-time contract work for JATA out of her home in Michigan. (Tully Dep. 56:13-21, 192:4.) This work consisted of research projects assigned to Lipinski by Tully in collaboration with Mario Perez, one of JATA's directors. (Perez Dep. 25:3-25, Def.'s Ex. 7, Dkt. # 15-2, at 30-37; Tully Dep. 56:22-57:23.)

---

[1] For ease of access, the initial citation of each fact exhibit contains the party's exhibit number as well as the docket number and span of pages assigned to that exhibit by the court. Unless otherwise noted, citations to depositions refer to the excerpt provided by Defendant.

In 2007, Tully—with the approval of Joanne Webb, JATA's CEO—began developing a new, full-time, Atlanta-based position to provide research and support on regulatory compliance issues and other frequent questions encountered by JATA's clients and HIM consultants. (Tully Dep. 63:6-64:21, 66:5-9; Webb Dep. 25:8-10, Def.'s Ex. 6, Dkt. # 15-2, at 21-29.) As Lipinski's contract work had largely been in this area, Tully approached her about taking the job. (Tully Dep. 64:22-65:14, 65:20-66:4.) In a letter dated July 2, 2007, JATA officially offered the position to Lipinski, who accepted. (7/2/07 Letter, Pl.'s Ex. 15, Dkt. # 19-2, at 67.) Lipinski, in consultation with Tully, drafted the job description and came up with a title: HIM Regulation, Research, and Product Development Specialist (the "HIM position"). (Tully Dep. 66:10-17; 8/25/07-8/26/07 Emails, Pl.'s Ex. 16, Dkt. # 19-2, at 68-70.)

Lipinski originally was to start in the HIM position in JATA's Atlanta office on September 1, 2007, but complications with her right prosthesis prevented her from moving to Atlanta at that time. (Lipinski Decl. ¶ 25.) On October 15, 2007, Lipinski began working full-time for JATA out of her home in Michigan, still as an hourly employee and on a trial basis, pending her move to Atlanta, which was now scheduled for early 2008. (Tully Aff. ¶ 11.) However, on October 26, 2007, Lipinski sent an email to Tully and Webb resigning from the HIM position, citing a need to remain in Michigan while dealing with her continuing health issues and concerns about maintaining her social security disability income. (10/26/07 Email, Def.'s Ex. 4, Dkt. # 15-1, at 43-50.) At deposition, Tully testified that she was "disappointed" from "a business perspective" when Lipinski resigned, as the HIM position would remain unfilled even after she and

3

other JATA employees had made several accommodations for Lipinski to ease her relocation to Atlanta. (Tully Dep. 100:15-102:21.)

JATA did not begin soliciting applications for the HIM position until the end of December 2007. (Def.'s Resp. to Pl.'s 1st Interrogs. 9, Pl.'s Ex. 8, Dkt. # 19-2, at 38-47.) Both Tully and Webb testified at deposition that they delayed advertising the opening to give Lipinski the chance to change her mind about resigning; had Lipinski committed to working full time in Atlanta, they attested, she would have been rehired for the HIM position. (Tully Dep. 99:6-100:5; Webb Dep. 67:2-18.) Throughout this period, Lipinski and Tully continued to communicate via email and telephone "fairly frequently," that is, once every few weeks. (Tully Dep. 103:11-17.) Tully kept Lipinski apprized of JATA's recruitment efforts for the HIM position, (*id.* at 103:19-104:18), and Lipinski updated Tully on the status of her health, eventually informing Tully that she needed revision surgery on her right leg, (12/17/07 Email, Tully Aff. Ex. D; 1/10/08 Email, Tully Aff. Ex. E; 3/21/08 Email, Tully Aff. Ex. F).

Once the HIM position had been posted for some time without a viable candidate emerging, Tully and Webb decided to make it a remote position. (Def.'s Resp. to Pl.'s 1st Interrogs. 9.) Although Webb confirmed at deposition that she still would have preferred to keep the HIM position office-based, they concluded that this might not be feasible given the dearth of qualified applicants. (Webb Dep. 56:2-23; *see also* Tully Dep. 112:3-12, Pl.'s Ex. 4, Dkt. # 19-2, at 9-26.) There is some dispute as to exactly when this determination was made. Tully and Webb recall that it was sometime in March or April of 2008, (Tully Dep. 112:1-19; Webb Dep. 55:4-56:1, Pl.'s Ex. 13, Dkt. # 19-2, at 58-64; *see also* Def.'s Resp. to Pl.'s 1st Interrogs. 9), while Perez remembers

4

it being discussed as early as February 2008, (Perez Dep 116:10-117:19). In any case, JATA began advertising the HIM position as a remote position on internet message boards and in a few newspapers in mid-April 2008. (Def.'s Resp. to Pl.'s 1st Interrogs. 9; Kallioinen Decl. ¶ 3, Def.'s Ex. 8, Dkt. # 15-2, at 38-40.)

When JATA switched the HIM position from an in-office to a remote position, Webb told Tully to inform Lipinski. (Webb Dep. 70:24-71:8, Pl.'s Ex. 13.) Tully claims that she called Lipinski sometime in April and told her about this change, stating that the HIM position was still open to Lipinski if she committed to it in a letter of intent. (Tully Dep. 104:19-105:6, 113:12-115:2, Pl.'s Ex. 4.) However, emails Lipinski sent to Tully on April 24, 2008, and May 5, 2008, suggest that Lipinski still thought the HIM position was office-based, and there is no indication in the record that Tully sought to correct this apparent impression. (4/24/08 Email, Pl.'s Ex. 18, Dkt. # 19-2, at 73 ("I will keep my ears open if I hear of anyone looking for a position in Atlanta. Hopefully you will fill the position soon."); 5/5/08 Email, Pl.'s Ex. 19, Dkt. # 19-2, at 74-75 ("If you haven't filled your office position by the time the 2009 final rule comes out and you do need the help, please let me know.").)

Lipinski alleges that she first learned the HIM position had been made remote in a telephone call with Tully on May 18, 2008 (the "May 18 call"). (Lipinski Decl. ¶ 42.) As Lipinski recollects, after discussing the revision surgery she had in April, Tully told her that they had made the HIM position a remote position and, if she was still interested, she would have to commit to working full time. (Lipinski Dep. 61:23-62:9, Pl.'s Ex. 7, Dkt. # 19-2, at 31-37.) Lipinski said that she did not have a problem with that, provided she could work from home and her schedule could accommodate her

5

weekly medical appointments. (*Id.* at 62:10-15.) Tully assured her that she was not required to keep nine-to-five hours and could easily work around her appointments, and then asked if she was going to need any more surgeries. (*Id.* at 62:15-20.) Lipinski responded that she could not know for sure and, although her latest surgery had went well and she was hopeful that it finally had taken care of the problems with her right leg, she could not guarantee another would not be needed in the future. (*Id.* at 62:20-25.) At the end of the conversation, Lipinski remembers saying: "This would be perfect, Mel. I think the timing is finally correct, you know, right, and you know, sounds like we're good to go." (*Id.* at 63:9-12.) Tully then indicated that she was going to continue interviewing other candidates and she would touch base with Lipinski in a few weeks to "see how your legs are coming along." (*Id.* at 63:13-16.) Lipinski came away from the conversation feeling that Tully was "concerned about [my legs] effecting [sic] my ability to start work." (*Id.* at 68:20-23.)

Tully has a different impression of the May 18 call. She claims that her questions about Lipinski's surgeries and medical condition were asked out of concern for Lipinski's well being and were a regular part of her communications with Lipinski, denying that she was apprehensive about Lipinski's disability getting in the way of her work. (Tully Dep. 120:20-122:9, 123:12-24.) Tully disagrees that Lipinski definitively committed to the HIM position during the call, but instead claims Lipinski asked "to think about it" and "waffl[ed] as to [whether she could] make a full-time commitment." (*Id.* at 122:10-17.)

Less than a week later, around May 23, 2008, JATA received an application for the HIM position from Angela Carmichael, who lives in Florida. (Kallionen Decl. ¶ 4.) After an initial telephone interview with JATA's recruitment specialist, Sara Kallionen,

Carmichael had an in-person interview at JATA's offices with Tully and Perez on June 9, 2008. (*Id.* ¶ 5.) JATA offered Carmichael the HIM position on June 10, 2008, and Carmichael quickly accepted. (*Id.* ¶ 16.)

Meanwhile, Lipinski claims she left Tully at least one telephone message a week or two after the May 18 call, reassuring Tully that her legs were doing fine, she was excited about taking on the HIM position, and she was ready to set a start date. (Lipinski Decl. ¶ 49; Lipinski Dep. 68:20-69:2, 69:18-70:4, 71:14-72:4, 133:11-134:15, 138:21-139:21, 142:13-22, Reply Ex. 1, Dkt. # 22-1, at 3-27.) However, Tully alleges that no such messages were left until after the HIM position had been filled, (Tully Dep. 125:3-126:11, 128:15-22), and JATA points out that Lipinski's testimony is somewhat inconsistent as to the timing of these telephone calls, (*see* Lipinski Dep. 77:5-12, Reply Ex. 1 (admitting she might not have left any messages for Tully until June 19, 2008); *id.* at 140:17-142:11 (acknowledging that in her sworn EEOC Intake Questionnaire she wrote that, after Tully neglected to follow up on the May 18 call, she left messages "after about 3 weeks"); *id.* at 142:23-143:1 (noting she cannot be certain of the exact days of her messages to Tully without pulling her phone records)).

The first confirmed contact between Lipinski and Tully after the May 18 call was an email Lipinski sent on June 14, 2008, a few days after Carmichael accepted the HIM position. (Tully Aff. ¶ 16.) In the email, Lipinski wrote that her leg was "healing nicely" and "[w]e can set a start date if you are serious about me working with you again." (6/14/08 Email, Tully Aff. Ex. G.) Tully did not respond right away, and Lipinski followed up on June 19, 2008, by leaving Tully a telephone message and emailing Perez, with whom she had also kept in periodic contact. (6/19/08 Email, Def.'s Ex. 2, Dkt. # 15, at

7

21-23; Perez Dep. 114:3-116:1.)  Perez called Lipinski shortly after receiving her email, and Lipinski explained that she had been trying to contact Tully because she wanted the HIM position.  (Lipinski Dep. 96:9-18, Def.'s Ex. 1, Dkt. # 15, at 3-20.)  Perez said he had not known that Tully had talked with Lipinski about coming back to the HIM position now that it was remote, but broke the news to Lipinski that the position had been filled.  (*Id.* at 96:19-97:15; Perez Dep. 137:18-25.)  Within an hour, Tully also telephoned Lipinski and confirmed that JATA had hired someone else.  (Lipinski Dep. 97:17-98:15; Tully Dep. 129:3-23.)  Tully offered to hire Lipinski as a traveling consultant, but Lipinski declined, reiterating that her disability prevented her from working in that capacity.  (Lipinski Decl. ¶¶ 51-52; Lipinski Dep. 98:7-11.)

JATA and Lipinski offer conflicting views on the level of interest expressed by Lipinski after JATA's prolonged efforts to fill the HIM position, that is, after the job became remote but before Carmichael was hired.  Tully alleges that Lipinski "never stepped up and said, please let me have the job, I commit to a full-time position."  (Tully Dep. 122:16-17.)  In fact, Tully claims, it would have been "much easier" to hire Lipinski, who was familiar with JATA's business and whose skill set was known to Tully, but Lipinski "never took" the "opportunity."  (*Id.* at 126:12-16.)  Webb echoes the conviction that, had Lipinski committed to returning to the HIM position, it would have been hers.  (Webb Dep. 71:18-23, 77:5-19.)  Lipinski believes she did make such a commitment during the May 18 call.  (Lipinski Dep. 66:3-6, Pl.'s Ex. 7.)  Nevertheless, she admits to being thrown off-guard by Tully's comment about interviewing other candidates at the end of that call.  (*Id.* at 65:5-10.)  When asked at deposition whether she could have

asked Tully to stop the search because she wanted the job, Lipinski answered she "should have" done so. (*Id.* at 95:18-25.)

On June 20, 2008, Lipinski filed a charge of discrimination with the EEOC, alleging that JATA discriminated against her on the basis of disability when it did not rehire her for the remote HIM position. (EEOC Charge of Discrimination, Pl.'s Ex. 24, Dkt. # 19-2, at 81.) The EEOC filed suit against JATA on August 1, 2011, and JATA moved for summary judgment on April 2, 2012.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252.

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific

facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

### III. DISCUSSION

The EEOC avers that JATA "engaged in unlawful employment practices" in violation of the ADA by "refusing to hire Lipinski" for the HIM position "due to her disability, bilateral amputee below the knees." (Compl. ¶ 8, Dkt. # 1.) JATA disputes this charge, asserting that it is entitled to summary judgment because: (1) the EEOC

has no direct evidence of discrimination; and (2) the EEOC cannot establish a claim using indirect evidence because Lipinski voluntarily declined to accept the HIM position and there is no evidence that Tully, as decisionmaker, had any discriminatory animus towards Lipinski.  While the EEOC does not challenge JATA's contention that it lacks direct evidence of discrimination, it has demonstrated a genuine issue of material fact—whether Lipinski attempted to accept the HIM position—that precludes summary judgment on the indirect-evidence claim.

### A.  Standard for ADA Claims Based on Indirect Evidence

Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  When a plaintiff seeks to establish a case of discrimination under the ADA through indirect evidence, as the EEOC does here, the familiar *McDonnell Douglas* burden-shifting framework applies.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, --- F.3d ----, 2012 WL 1889389 (6th Cir. May 25, 2012) (en banc).[2]

---

[2] After the Sixth Circuit issued its *en banc* decision in *Lewis*, both parties submitted supplemental briefs addressing its potential impact on JATA's summary judgment motion.  The EEOC is correct that it has little bearing on the matter presently before the court, *i.e.*, whether the EEOC can survive summary judgment under the *McDonnell Douglas* analysis.  *Lewis* concerned a plaintiff's ultimate burden to establish causation under the ADA, holding that she must establish her disability as the but-for cause of her employer's adverse decision, rather than the "sole reason" for that decision.  *Lewis*, 2012 WL 1889389, at *1, *9.  The whole point of the *McDonnell Douglas* methodology is to create a mandatory presumption that this burden is met whenever the plaintiff can establish a *prima facie* case of discrimination and prove that

As an initial matter, the EEOC must make out a *prima facie* case of employment discrimination by showing that:

> 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)). Once a *prima facie* case is established, "the burden shifts to [JATA] to articulate a non-discriminatory explanation for the employment action, and if [JATA] does so, the burden shifts back to the [EEOC] to prove that [JATA's] explanation is pretextual." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)).

### B. The *Prima Facie* Case: Adverse Employment Action

JATA does not contest that Lipinski is disabled, Lipinski was otherwise qualified for the HIM position, and JATA knew of Lipinski's disability. Neither can it be reasonably disputed that, after JATA passed over Lipinski as a candidate for the remote

---

any legitimate, nondiscriminatory reason offered for the employer's adverse decision is pretextual. *Monnett*, 90 F.3d at 1185. Of course, an ADA plaintiff could also prevail by introducing direct evidence that she would not have suffered an adverse employment action but for her disability. But there is no indication that the *Lewis* court meant to disturb the alternative path of proving a claim using indirect evidence under the *McDonnell Douglas* framework. *Cf. Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (clarifying that whether employee "was discharged solely by reason of the disability" is not element of ADA *prima facie* case). Indeed, it seems especially unlikely that the contours of a *prima facie* case under the ADA will be altered in the wake of *Lewis*—at least, altered to the advantage of employers, as JATA contends—given that the "but-for" standard is arguably more lenient than the former "sole cause" inquiry. *See Lewis*, 2012 WL 1889389, at *11 (Clay, J., concurring in part and dissenting in part).

12

HIM position, it remained open and another applicant was eventually hired. Rather, the EEOC's *prima facie* case hinges on whether Lipinski suffered an adverse employment decision. JATA argues she did not because, when she and Tully discussed the HIM position during the May 18 call, she chose not to accept it. *Cf. Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) ("When an employee voluntarily resigns, he cannot claim that he suffered an adverse employment decision under the ADA . . . ."). Therefore, JATA reasons, Lipinski never put herself forward as a serious candidate for the HIM position, and JATA did not make an adverse employment decision by declining to rehire her.

Contrary to JATA's assertions, the EEOC has shown a genuine fact dispute on this point. According to Lipinski, she ended the May 18 call by telling Tully: "[t]his would be perfect"; "I think the timing is finally correct"; and "sounds like we're good to go." (Lipinski Dep. 63:9-12, Pl.'s Ex. 7.) A reasonable jury could conclude that, with these statements, Lipinski signaled her commitment to the HIM position in the manner Tully and Webb said was required of her. That Lipinski later testified at her deposition that she "should have" said something when Tully indicated that JATA would continue looking at other applicants may influence the fact finder's view, but does not change this conclusion. (*Id.* at 95:18-25.) Given subsequent events, it is completely understandable that, in hindsight, Lipinski would express regret in not challenging Tully on those remarks, but her failure to do so need not be seen as tantamount to an admission that she did not attempt to accept the position during the May 18 call. The issues of what was communicated during that conversation and whether the statements made by Lipinski are interpreted as a commitment to the HIM position will depend on

13

whether Tully's or Lipinski's account is more credible—an inquiry that is not appropriate on summary judgment. See *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Moreover, Lipinski also testified that, one or two weeks after the May 18 call, she left at least one telephone message for Tully asking to set a start date. (*E.g.*, Lipinski Dep. 133:11-134:15, Reply Ex. 1.) So, even if Tully is to be believed that Lipinski did not unequivocally commit to the HIM position during the May 18 call, a reasonable jury could decide that she did attempt to do so in subsequent telephone messages left before JATA hired Carmichael. JATA attempts to discount this issue of material fact by pointing to Lipinski's deposition testimony that she could not be sure of the exact dates of such calls. (*See id.* at 77:5-12, 140:17-142:11, 142:23-143:1.) Again, this is an issue of credibility that must be put to the fact finder rather than resolved by the court.

JATA's citations to *Hedrick v. Western Reserve Care System*, 355 F.3d 444 (6th Cir. 2004), are inapposite. The *Hedrick* court, in determining whether the plaintiff had established the "otherwise qualified" prong of her *prima facie* case, considered whether the employer was *required* to offer various positions to the plaintiff as a reasonable accommodation once her disability rendered her unable to perform the duties of her previous job as a staff nurse. This is not the EEOC's argument in the present case. The EEOC acknowledges that JATA was under no obligation to rehire Lipinski after she voluntarily resigned from the HIM position. However, when JATA *chose* to approach Lipinski with the opportunity, as Tully admits she did in the May 18 call, and if Lipinski

14

did in fact communicate to Tully that she wished to take the job, JATA did have the duty to refrain from rejecting her candidacy because of her disability. This is the violation that the EEOC seeks to prove, and in this context JATA's failure to rehire Lipinski would constitute an adverse employment decision. Accordingly, the EEOC has established a genuine issue of material fact as to whether it can establish a *prima facie* case of disability discrimination.

### C. Non-Discriminatory Explanation and Pretext

Since the EEOC can proceed past the *prima facie* inquiry, JATA must articulate a legitimate business reason for declining to rehire Lipinski. The non-discriminatory explanation it offers is similar to its defense on the adverse-employment-decision prong of the *prima facie* case: Lipinski did not accept the HIM position despite having the opportunity to do so. Thus, the burden shifts back to the EEOC to demonstrate that this explanation is pretextual. It can accomplish this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

As discussed above, the EEOC has shown a genuine fact dispute as to whether JATA's articulated rationale is "factually false." *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009). This alone is enough to proceed past summary judgment, as it suggests JATA's non-discriminatory reason is unworthy of credence. As the Supreme Court has explained:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, no additional proof of discrimination is required[.]

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis, internal quotation marks, and footnote omitted).

The EEOC's position is further bolstered by evidence in the record from which a reasonable jury might conclude that Tully was hesitant to hire Lipinski because of her disability. *See Hicks*, 502 U.S. at 519 (confirming that ultimate question in pretext analysis is whether "the factfinder . . . believe[s] the plaintiff's explanation of intentional discrimination.") According to Lipinski, after she expressed her interest in the remote HIM position in the May 18 call, Tully responded by asking whether Lipinski would need more surgery, (Lipinski Dep. 62:15-20, Pl.'s Ex. 7), and closed the conversation by saying she would check back in a few weeks to "see how [Lipinski's] legs are coming along," (*id.* at 63:13-16). While JATA and Tully aver that such comments were part and parcel of Tully and Lipinski's interactions and indicative of nothing other than Tully's personal interest in Lipinski's health, (Tully Dep. 120:20-122:9, 123:12-24), Lipinski interpreted these remarks as concern about her ability to work, (*id.* at 68:20-23). A fact finder might agree with Lipinski; it is not for the court to choose whom to believe.

Neither does the same-actor inference merit summary judgment for JATA. First, it is questionable whether the same-actor inference—"which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee," *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995)—even applies to

the facts of this case. JATA maintains that Tully offered the HIM position to Lipinski in the May 18 call, so it is illogical that Tully's hiring of Carmichael less than one month later was motivated by discrimination against Lipinski. But, as already discussed extensively, there is an issue of fact as to whether Tully offered—or, perhaps more appropriately, allowed Lipinski to accept—the HIM position during the May 18 call.

Second, there is other evidence in the record suggesting that Tully was reluctant to rehire Lipinski, notwithstanding the fact that Tully had hired her for the office-based HIM position the year before. Although Tully and Webb made the decision to start looking for someone to fill the HIM position remotely no later than mid-April 2008, and Webb directed Tully to inform Lipinski of this decision, Lipinski claims Tully delayed doing so until the May 18 call—a claim that finds a modicum of support in Lipinski's emails to Tully on April 24, 2008, and May 5, 2008. Under these circumstances, the court does not find the same-actor inference dispositive. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) ("Although the factfinder is permitted to draw [the same-actor] inference, it is by no means a mandatory one, and it may be weakened by other evidence."). There are genuine issues of material fact as to whether JATA's proffered reason for not rehiring Lipinski is pretextual, so summary judgment is not warranted.

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 17] is DENIED.

                                                   s/Robert H. Cleland
                                                  ROBERT H. CLELAND
                                                  UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 29, 2012, by electronic and/or ordinary mail.

     s/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\11-13347.JATHOMAS.SummaryJudgmentADAFailureToHire.set.wpd